UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **FRANK A. ROSE,** | : | |
| | : | |
| **Plaintiff,** | : | Civil Action |
| | : | No. 1:26-cv-00900-PTG-WBP |
| **v.** | : | |
| | : | |
| **KATHRYN A. HEWITT,** | : | June 18, 2026 |
| | : | 10:40 a.m. |
| **et al.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| .............................. | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:

**Caroline Lovett Callahan, Esq.**
OFFIT KURMAN
8000 Towers Crescent Drive
Suite 1400
Tysons Corner, VA 22182
703-745-1800
Email:
Caroline.callahan@offitkurman.com

**Kimberly C. Lau, Esq.**
OFFIT KURMAN
590 Madison Avenue
Suite 6th Floor
New York, NY 10022
347-589-8549
Fax: 212-545-1656
Email: Kimberly.lau@offitkurman.com

APPEARANCES: (Cont.)

For Defendant United States of America:

**Dennis Carl Barghaan, Jr., Trial Attorney**
UNITED STATES ATTORNEY'S OFFICE
2100 Jamieson Avenue
Alexandria, VA 22314
(703)299-3700
Email: Dennis.barghaan@usdoj.gov

For Defendant Kathryn A. Hewitt:

**Mary E. Kuntz, Esq.**
KALIJARVI CHUZI NEWMAN & FITCH PC
818 Connecticut Avenue, NW
Suite 1000
Washington, DC 20006
202-331-9260
Fax: 1-855-231-4460
Email: Mkuntz@kcnlaw.com

Court Reporter:

**Scott L. Wallace, RDR, RMR, CRR**
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, VA 22314-5798
Cell: 443-584-6558
Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

**MORNING SESSION, JUNE 18, 2026**

(10:40 a.m.)

THE COURTROOM CLERK: The Court calls *Frank A. Rose versus Katherine A. Hewitt, et al.*, Case Number 1:26-cv-900.

May I have appearances, please, first for the plaintiff?

MS. CALLAHAN: Good morning, Your Honor. Caroline Callahan here for the plaintiff.

MS. LAU: Good morning, Your Honor. Kimberly Lau for the plaintiff.

THE COURT: Good morning to both of you.

MR. BARGHAAN: Good morning, Your Honor. Assistant United States Attorney Dennis Barghaan on behalf of the United States.

THE COURT: Good morning to you.

MS. KUNTZ: Good morning, Your Honor. Mary Kuntz for Defendant Katherine Hewitt.

THE COURT: Good morning to you, as well.

MR. BARGHAAN: Your Honor, we're here -- we have two motions to dismiss. Obviously, we'll take the Court's lead on which you prefer to hear from first.

THE COURT: This is how I plan to proceed: I'm going to hear from -- both motions at the same time, and then there can be a single response from plaintiff, and then you all get a second chance to finish up.

MR. BARGHAAN: Does the Court have a preference on which one of us begins?

THE COURT: You're up at the podium, so you take it.

MR. BARGHAAN: I should have known that I was setting myself up for that. Good morning, Your Honor. The matter has been fully briefed, and I'm not going to simply reiterate everything that's in our papers this morning. I'll simply provide a brief précis of our position.

The United States' motion, as Your Honor knows, is quite limited here, and only concerns the plaintiff's claims, to the extent that they rely on his allegations about Ms. Hewitt's testimony at the Department of Energy's request to the agency's official investigation into plaintiff's conduct.

And that includes both -- that includes his employment-related conduct towards Hewitt herself when they both worked at the agency.

There are two concessions here by the plaintiff that I think further limit the Court's -- the issue before the Court. And the first is plaintiff has explicitly stated that the Department of Energy's official investigation and Ms. Hewitt's statements, as a part of that investigation, had nothing to do with his defamation claims. That's Counts 1 and 2, I believe, of the currently operative complaint.

And, thus, the United States' motion to dismiss is really only geared towards the intentional infliction of emotional distress claim; and the second, the plaintiff has conceded, this time more through silence, that, if the United States is the

correct defendant on that portion of the intentional infliction claim, that this Court lacks jurisdiction to entertain any Federal Tort Claims Act action arising out of the government's Westfall Act certification.

And so, the only question on the United States' motion for Your Honor is whether the Justice Department correctly certified that Ms. Hewitt was acting within the scope of her federal employment and is entitled to the absolute immunity that Congress dictated through the Westfall Act when she provided testimony, information, at the Department of Energy's express request, to the agency's investigation into plaintiff's conduct, which includes his employment-related actions towards her at Energy. And, for the reasons we've detailed in our brief, that question should be answered in the affirmative.

There has been some back and forth about which body of scope of employment law applies to that question, whether it's the District of Columbia or it's Virginia. As we've said in our reply memorandum, I don't believe that that is anything more than an academic exercise.

THE COURT: Because it's consistent. Both jurisdictions' handling of the issue is similar.

MR. BARGHAAN: Correct. I mean -- so, the -- it is our view that the District of Columbia law is the appropriate standard here, but we don't think the answer changes if it is Virginia.

The reason we say District of Columbia law applies is, as we've said, the Federal Tort Claims Act, which is what governs the United States' liability, governs the scope of employment question, is dictated by state law.

And, as the Supreme Court held 65 years ago in *Richards*, it is all of the states' law that applies, which includes its conflicts provisions.

And, as we've stated from -- there is Virginia authority for the proposition that, when it comes to allegations that sound in defamation like these, it is where the last act is that completes the tort, and that is where the message is received. And the message here was received through the Department of Energy in the District of Columbia.

If District of Columbia law applies, there's certainly no question that these limited acts of Ms. Hewitt are in the scope of her employment. *Council of Islamic Americans* against *Ballenger*, the *Wuterich* decision, both from the D.C. Circuit, stand for that proposition.

But, as we've said, it does not change if it moves to Virginia as the scope standard here. Providing testimony or information, if we don't want to call it like official testimony, at the employer's request about job-related conduct, is unquestionably a job-related function. And because it was at the request of the Department of Energy at the very least, it is not wholly arising out of a personal motivation for Ms. Hewitt.

My good colleagues on the other side talk about Judge Collin's decision in the Western District, in the *Auckland* case, we believe it's inapposite here for the simple reason that *Auckland* relates to an employee who, herself, affirmatively -- or himself -- affirmatively raised an allegation of harassment with their employer.

Here, you have the employer asking for the information, and that in and of itself makes *Auckland* inapposite. And regardless of that, for the reasons we've articulated, we believe, with all respect to Judge Colin, that he got the scope question wrong there, and that his decision doesn't track with the significant nature of harassment reporting in the workplace and how that is essential to any workplace and is the job-related function of --

THE COURT: Right, because it's a very part of the policy of the department to report and to participate.

MR. BARGHAAN: It is -- it is unquestionably the policy of both the Department of Energy and the Department of Defense to report allegations of harassment, and that's for good reason. Not only is it to ensure a safe and appropriate workplace for all employees, but it also is endemic to the employer's obligations under Title VII, that they have a mechanism by which an employee can avail themselves of the employer's protection for alleged acts of harassment.

Let me posit this scenario. If an employee -- if an

employer like the Department of Energy or the Department of Defense says, If you believe you are the victim of harassment, or you believe that you've been the victim of some employment-related misconduct, as Ms. Hewitt alleged here, you should report it in X, Y, and Z fashion.

Well, when they report it in X, Y, Z fashion, and the employer's officials, or the people they designate to do such things, come to investigate and say, Tell us more, my colleagues would suggest that the employee is acting outside of the scope of their employment when they accede to that request and give them the information that they're asking for.

And, for that reason, Your Honor, we believe that Ms. Hewitt was, for these limited purposes, acting within the scope of her employment, and that any claim in this complaint that arises out of her testimony to the Department of Energy should be dismissed for lack of subject matter jurisdiction.

THE COURT: Now, with respect to the scope of employment, is that something for me to decide at this stage or later?

MR. BARGHAAN: We do. Now, Your Honor, for two reasons: Number one, there is no real factual dispute here. The plaintiff's opposition doesn't raise a factual dispute. There's really no question about what --

THE COURT: -- so, even --

MR. BARGHAAN: -- is happening.

THE COURT: So, even taking the allegations solely as

alleged in the complaint --

MR. BARGHAAN: -- correct --

THE COURT: -- it is sufficient at this stage? That's your position?

MR. BARGHAAN: It is, Your Honor. So, for not only the reason I just articulated, but also, that is something that is significant for purposes of the Westfall Act, significant authority we've provided in our papers from the Fourth Circuit and the Supreme Court that state that this kind of absolute immunity that the Westfall Act provides is identical to other forms of immunity to provide --

THE COURT: -- to stop the litigation altogether.

MR. BARGHAAN: Correct.

THE COURT: Okay.

MR. BARGHAAN: Correct. And I thank the Court for its time.

THE COURT: Thank you. So now I'll hear from you, Ms. Kuntz. Go ahead.

MS. KUNTZ: Your Honor, this Court does not need to resolve the scope of the United States' Westfall certification to dismiss every claim against Ms. Hewitt.

Whether the courts affirm certification, leaving Ms. Hewitt answerable only on paragraphs 106 through 111, or sets it aside and returns the full set of statements to Ms. Hewitt, the answer is the same. The amended complaint fails under Rule

12(b)(6), and it is independently barred by Virginia anti-SLAPP statute. I have four points to make. The first is that this pleading fails under *Iqbal*. The defamation theory rests on three bases, and each one collapses. The 11 specific statements are lifted near verbatim and in sequence from Ms. Hewitt's sworn declaration of privileged judicial filing.

I provided the argument for this in both the memorandum and the reply. The workplace conduct statements within those 11 identify no occasion, no recipient, no date, no medium, the factual context necessary to achieve plausibility.

And the media outlet smear campaign at 106 through 111 stripped of conclusory labels and lacking contextualizing facts, alleges only that unnamed people said unspecified things to unidentified recipients. Nothing that achieves plausibility.

Second, the amended complaint fails the threshold inquiry required under *Milkovich*. Before the Court reaches any element, it decides, as a matter of law, whether the challenged words are even capable of being proven false. And for the opinion-laden statements that determination requires context that this pleading never supplies.

Third, Mr. Rose has pleaded himself into public official status in the amended complaint, but has --

THE COURT: What was that status? I didn't hear that.

MR. BARGHAAN: Public official status.

THE COURT: Um-hmm.

MR. BARGHAAN: But has not pleaded actual malice. His own allegations, Senate confirmation, authority at NNSA, establish the Rosenblatt factors. The four theories he offers for malice are each foreclosed by *Fairfax*, by *Harte-Hanks*, and by *St. Amont*, none of which the opposition addresses.

And finally, the Virginia anti-SLAPP statute independently immunizes Ms. Hewitt on every count.

THE COURT: But the issue with the Virginia SLAPP statute is there's an exception in there that speaks to knowingly false statements. And so, at this stage, given the allegation, how can I reach it?

MS. KUNTZ: So, the exception in the Virginia anti-SLAPP statute, as we can see in the *Fairfax* case, is generally handled by evaluation under the actual malice standard. It's true that it is not the same in the language of the Virginia statute, but it is also true that the Fourth Circuit has regularly treated -- and Virginia law, in *Patel*, most recently in 2025, has treated this as being in alignment with the actual malice standard.

THE COURT: And I understand -- I guess my point is, and I'm not saying that your assessment of some of the deficiencies in the complaint are not accurate, what you have pointed out; however, with amendment, if those could be fixed, then it would not be proper for me to dismiss on the basis of the Virginia SLAPP statute and the immunity there, because there is a possibility of pleading and -- or pleading facts to establish

actual malice. I'm not saying that they're there now, but there is the potential.

MS. KUNTZ: Your Honor, cases that have been removed to federal courts have to -- motions that are pending in the state court, such as the plea in bar, the renewed plea in bar that --

THE COURT: I'm not revisiting the plea in bar now. I know you attached or filed the entire record that happened in the state court at this stage, but I don't go just perusing the record to address issues. If you want to key that up for me to address for some other time and set it for a motion, I will hear it then.

MS. KUNTZ: Yes, ma'am. The plea in bar is the anti-SLAPP motion, and so I have incorporated it here in the 12(b)(6).

And because the knowing false exception is governed by the sustained plausibility standard that Mr. Rose cannot meet, it would appear that the anti-SLAPP motion could be considered here on this point. But if the Court chooses not to, we do have other bases that I would like to address.

The --

THE COURT: And I think you've done so in pointing out the deficiencies with respect to how defamation has been pled, that it doesn't provide the context, as you pointed out.

MS. KUNTZ: There are a couple of points that I would like to augment the pleadings, if you would allow.

In the determination that Rose is a public official, as a

matter of law, this is established under *Rosenblatt v. Bauer*. The opposition argued that this was not appropriate for determination by the Court at this stage.

In fact, in *Rosenblatt v. Bauer*, at note 15, the Supreme Court stated that public official status is a question for the Court; not the jury.

The Fourth Circuit has applied this, most particularly in *Horne v. WTVR, LLC*.

THE COURT: I want to be clear. I don't disagree with you on any of this, and so that's what I've tried to make clear.

MS. KUNTZ: Okay.

THE COURT: The only part I'm telling you I'm not reaching is Virginia SLAPP today. I agree with the deficiencies that you have identified in the complaint in terms of how defamation has been pled in terms of the context, as well as what you have said about actual malice is required.

MS. KUNTZ: Do you want me to argue the anti-SLAPP now or --

THE COURT: No, I do not.

MS. KUNTZ: Or would you like me to sit down?

THE COURT: Please sit down. Thank you. Thank you, ma'am. Okay.

MS. LAU: Good morning, Your Honor.

THE COURT: Good morning.

MS. LAU: I would like to first address the government's

motion. And counsel is correct that the singular allegation at issue is paragraph 112 of the complaint, of the amended complaint, as to whether the statements that were provided by Ms. Hewitt during this official investigation by the Department of Energy was, in fact, within the scope of employment; following the line of cases from *Parker* and *Auckland*, that those statements were not within the scope of employment.

I know counsel has made arguments that *Parker* was just wrong. And, in reaching that decision, *Parker* was notably decided five years after *Brown* and really wanted to get back to the principles of -- you know, first principles of *respondeat superior* and whether this was a job-related service.

And so what I believe the government is having this hinge on factually in this case in this argument is, Well, you know, Ms. Hewitt was not going in voluntarily to provide a report of sexual harassment, she was pulled in from her supervisor or from the Department of Energy and requested to provide such testimony, and, therefore, that falls within ambit of her job duties, and, therefore, it is within the scope of employment.

However, that just -- that analysis cannot stand when you look at the job functions and you look at the policies that they provide. It's really more at a managerial level on how to handle the reporting process of complaints, bonafide complaints of sexual harassment, which the amended complaint --

THE COURT: But your allegations indicate that this was

during an official inquiry to investigators, and so that is their argument as to what makes it different.

MS. LAU: Yes, Your Honor. We do say that it was during an official inquiry. However, she provided false statements during that official inquiry; not about her alleged experiences on the job at the DOE, notably, about experiences that she allegedly had at a prior private employer.

THE COURT: But in terms of her being brought in, it was based on her having been employed with the department, right, as part of --

MS. LAU: Correct, but the policies don't allow for false statements to be provided. That doesn't further the government's interest.

So, when you look at the public policy behind *Parker* and why they wanted to get back to first principles, it's because they didn't want to allow for a barrage of lawsuits to hinge on and to have *respondeat superior,* for these employers to hinge on acts that do not squarely fall with- -- that further the interest of the employer.

It doesn't further the interest of the government to facilitate false statements about an employee. It simply cannot stand under that analysis.

THE COURT: It furthers the government's role in investigating claims of sexual harassment, right? Because they -- that's part of the policy. And what they've attached and

you don't challenge is, you know, numerous citing of that policy and the laying out of that policy.

MS. LAU: We don't disagree that there is a policy, but that is not the end of the inquiry. Our argument is that the government's interest is not served, despite this policy, by allowing false statements to be made about another person when the sexual harassment at issue being reported is -- did not take place.

And even if Your Honor were to entertain that, we would ask that there must be some discovery, limited jurisdictional discovery to determine that the purpose of making those statements by Ms. Hewitt was wholly external versus only partially external, because that's what the government has argued, that, well, even if she's lied, she, at least partially, was serving the interests of the government by participating in this investigation.

THE COURT: How do you then deal with the portion of the FTCA that directly addresses claims arising out of libel and slander, which they've cited to.

MS. LAU: Well, when it comes to libel and slander, as long as it was for the job purpose, the job that you are hired to do --

THE COURT: -- okay. When would --

MS. LAU: -- she was hired as a communications expert.

THE COURT: When would that -- when would that ever, just

given your description there, when the job calls for it? Because what job would be calling for libel and slander, right?

I mean, there's this exception here for a reason. Okay?

MS. LAU: Your Honor, I can only stress that in the cases of *Parker* and *Auckland*, as well as *Gina Chin*, which *Brown* was premised on, I mean in those cases the job duties were squarely within -- or the acts at issue were squarely within the job duties.

You know, accepting fraudulent checks for deposit by a bank teller, that's accepting -- depositing checks is within a bank teller's duties, even if they're acting for personal gain. She wasn't hired to report sexual harassment.

THE COURT: I would think that participating in official inquiries would be part of any employee's duties, right, the official inquiries of their employer.

MS. LAU: I would argue that that is an -- that is an issue of fact that we would like to have jurisdictional, limited jurisdictional discovery on.

THE COURT: That does not appear to be a -- I understand your argument.

MS. LAU: Thank you. And just to put a fine point on it, Your Honor, because the government's argument only takes issue with paragraph 112, that is only one small portion of plaintiff's intentional infliction and emotional distress claim. And, for that reason, that would not affect the integrity of the entire

claim, and so the entire claim would still -- should still be sustained.

The -- moving on to a response to Ms. Hewitt's arguments regarding the defamation claims and defamation, per se, and IIED, I think a lot of the argument really rises and falls with whether or not Hewitt's declaration has been incorporated by reference into the amended complaint, which Hewitt has vigorously argued should be the case. That just cannot stand. There is a mention of it.

THE COURT: I agree with you on that. I'm not focused on the declaration.

MS. LAU: Okay. Okay. Really, we submit that we have sufficiently stated a claim for defamation under -- in the amended complaint pursuant to the *Goines* and *Skillstorm* precedents. *Goines* concluded not that the recipient or medium is required, *Goines* concluded that the document needed to show that there was an actual speaker, that there was a -- the substance of the statement was made, and why the statement was false, and we meet all three of those prongs in our complaint.

We identify the speaker as Ms. Hewitt. We identify the substance of the statements in these paragraphs of the complaint, 70 -- 57 through 70.

We also identify that -- why those statements were false. Plaintiff never did those, engaged in those actions. Paragraphs 78 through 92. He never engaged in any sexual harassment

regarding Hewitt.

And we also go a step further. We state that, in paragraph 101, that Ms. Hewitt knew that her statements were false at the time that she made them, and that --

THE COURT: But what you -- I don't think we have the details here in the complaint that are necessary, and I think it -- perhaps, when it was filed in state court, it could have been sufficient there, because they could have filed a Bill of Particulars to get that information, but when I just look at the allegations in the complaint here, it's just, you know, she said this to multiple people there's no details of, like, you know, the timing of when -- I think there was a starting in April of 2024, but you need something more than -- this is just too -- there's not enough meat or not enough underlying factual assertions here to get it to the plausible stage because there aren't the details.

And I know -- and I'm not getting into whether or not this tracks the declaration or not, okay. I'm not there. But, even in just looking at what is alleged here, I mean, there's -- because you have to allege enough to know that this is an actionable statement, right, in order to meet the defamation, to make it actionable, and I think, under *Skillstorm*, you don't meet it, because -- you don't include anything to link it to the reputational harm that is required. It's just very barebones here.

MS. LAU: Your Honor --

THE COURT: Because the statements could have been made to someone that, you know, it is privileged to say it to. There's nothing here -- you can't just say she made this statement to multiple people with -- there needs to be something more here than that.

MS. LAU: So, Your Honor, we submit that we have identified more than that. We've identified in paragraphs 95 through 100 that she did not make any of her defamatory statements to a governmental agency, to governmental entities, during any investigation by a governmental entity or administrative agency or even to -- so that --

THE COURT: That deals with the issue of whether or not it is a part of an inquiry, but that doesn't speak to -- because we're talking about the publication. You've got to do more than just say she said it to some people. Because in the cases -- and I think there was a *Food Lion* case cited in here somewhere where the statement for at least -- was said in the context that it was made here, and there was, you know, these individuals around. There's not even a location. There's nothing for the Court to look to, to infer anything. You need more than, "this was said to multiple people".

MS. LAU: Your Honor, we actually identify in quotes specific statements. We do give a general timeframe.

THE COURT: I'm telling you there's a problem, and I need

you to understand that. I don't need you to repeat things that are already in your briefs that I have read and, apparently, am not agreeing with, okay? I need you to hear and understand that what I'm saying is it is a problem, okay?

MS. LAU: Right.

THE COURT: So, if I give you leave to amend, you will know how to fix it.

MS. LAU: Okay. Thank you, Your Honor.

THE COURT: Now let's move on to the intentional infliction of emotional distress claim.

MS. LAU: Yes. For the intentional -- I take that, Your Honor, as an invitation or leave to amend, to amend our complaint further to identify and address the issues that Your Honor sees with the amended complaint.

THE COURT: And even with respect to what you're saying with respect to the media outlet, there are no specifics there either. You have to be specific enough in your amended complaint, okay.

MS. LAU: May we have leave to amend to make this --

THE COURT: I've already said that.

MS. LAU: Okay. All right. So, with respect to the intentional infliction of emotional distress claims, we have more than met the standards here.

The statements -- we've actually pleaded her subjective knowledge of falsity for actual malice. We've also stated how

her behaviors and her smear campaign has been extreme and outrageous conduct, and how plaintiff has been damaged by these --

THE COURT: How is it extreme? Because these claims, in particular, are disfavored in Virginia. It's an extra high bar to meet, even at the pleading stage, intentional infliction of emotional distress. What are the specific alleg- -- I mean, it must be such behavior that it shocks the conscience, and that can be decided at this motion to dismiss stage. And so I want you to point to me the portions of your amended complaint that do that.

MS. LAU: Your Honor, I would point you, then, to the section entitled "smear campaign", Sections 105 -- paragraphs 105 through 120. She knowingly and intentionally retaliated against Rose by making these statements, these false statements about him to a media outlet with an audience of millions of viewers.

This was not made to a friend or just to, you know, another colleague. This was intentionally made so that it would proliferate out over the --

THE COURT: Do you have -- what media outlet?

MS. LAU: Politico.

THE COURT: Okay. And was there an article?

MS. LAU: Yes.

THE COURT: Okay. All right. And where does it talk about that?

MS. LAU: We will -- we will include that in an amended

pleading. This was -- but I want to point out, though, that the defendant does know what outlet we're talking about. She does have notice of the statement and the media outlet that we're talking about, because she's referenced it in her declaration. She's referenced it in her briefs.

THE COURT: Okay. Is it in this amended complaint that I'm reading and that I have to assess what is a sufficient pleading for?

MS. LAU: We're happy to include that information in our amended complaint --

THE COURT: Okay.

MS. LAU: -- or second amended complaint. So that's how we have identified the outrageous and extreme conduct, because she intended to have this monumental reputational harm occur to our client.

She recruited others as well to join in and provide false statements against him. And, so, this wasn't just a singular effort on her own; this was a joint effort in order to, again, bring down his reputation and harm him and foreclose opportunities for him in the future.

This caused extreme distress to Mr. Rose and --

THE COURT: And is that laid out, who she was acting in concert with in this joint campaign?

MS. LAU: No.

THE COURT: Okay. I want to go back to the defamation

claims for a moment. Have you conceded that he is a public official?

MS. LAU: I think that -- that's probably a fair concession.

THE COURT: Okay. All right.

MS. LAU: And we argue that we still meet the actual malice standard anyway, because she knew that her statements were false.

So, any argument that there was lacking some subjective, you know, falsity standard, that doesn't apply here. She was a hundred percent aware of her actual knowledge of falsity for her statements. She was there.

She was -- she would have known if she was sexually harassed or not by plaintiff.

THE COURT: I understand your argument.

MS. LAU: I'm just making sure I address everything else.

(Brief pause in proceedings.)

MS. LAU: Your Honor, we just submit that we -- if Your Honor would allow us leave to amend, then we will make those changes to the complaint to reflect some of the concerns of the Court.

THE COURT: All right. Let me hear from you, Mr. Barghaan.

MS. LAU: Thank you.

MR. BARGHAAN: Very, very quick, Your Honor. Two things.

My colleague mentioned limited jurisdictional discovery. You won't find a request for that in their opposition. And there's good reason for that. This is a legal question, and the lack of discovery or the inability to obtain discovery is part of the absolute immunity that the Westfall Act provides.

Although it is true that the Westfall Act authority does allow a plaintiff to ask for limited discovery into a scope question, it requires there to be a fact in dispute, and it requires them to identify the discovery that would be sought, and how that discovery would assist the inquiry. They haven't done that here, and for good reason. It's a legal question we're dealing with: Is a response to an official inquiry of an agency in the scope of a federal employee's employment? The answer to that question is "yes."

My only other point, Your Honor, is --

THE COURT: Go ahead and finish your point, and then I'll ask my question.

MR. BARGHAAN: So, the only other point that I would ask or that I would make is, if the Court is intending to provide plaintiff with leave to amend his complaint, but at the same time agrees with the government that the one limited portion here, the testimony in response to the Energy Department's official inquiry is within the scope of Ms. Hewitt's employment, that any amendment not include that allegation.

I'm sure that my colleagues do not want to brief the scope

of employment question, the very same question a second time, and I certainly don't.

THE COURT: Address the *Parker* case, because plaintiff spent some time discussing it.

MR. BARGHAAN: So, I think that was a mistake on my colleague's part. *Parker* against *Carilion Clinic* is a Virginia Supreme Court case. We're not saying that's wrong. That is the -- that is -- if Virginia law applies, that is part of the body of authority that governs the inquiry. The case that we are saying was wrongly decided was *Auckland*, which is a district court decision from Judge Collin in the Western District.

So, we're not suggesting *Parker* is wrong.

THE COURT: But it's somewhat different anyway factually than what we have here.

MR. BARGHAAN: *Parker* is very different factually.

THE COURT: I'm talking *Aukland*.

MR. BARGHAAN: Yes. *Aukland* is factually different because there it is an employee -- to use a term *sua sponte* -- raising an allegation of sexual harassment with their employer.

Here, what you have is the employer asking for the information from the employee and the employee acceding to that request. That is fundamentally different than when it comes to scope of employment inquiry.

Now, to be sure, Your Honor, if this case, and if we had certified a different set of facts; that is, that an employee had

gone to their supervisor or gone to the agency's EEO office to allege sexual harassment, I would similarly be arguing that that was in the scope of their employment, and that *Auckland* decided that question wrongly. But that question isn't presented here because we are further along down the path towards scope of employment on the spectrum of scope of employment.

The factual scenario here, with respect to the United States' limited certification, is far more definitively in-scope than the circumstances in *Auckland*.

THE COURT: Thank you.

MR. BARGHAAN: Thank you, Your Honor.

THE COURT: Ms. Kuntz.

MS. KUNTZ: Your Honor, on the IIED claim, unlike in Counts 1 and 2, the defamation claims, the IIED claim, I believe, is not a clean *Iqbal* failure. The severity element retains some factual content even after *Iqbal*'s stripping; anxiety, loss of sleep, and counseling, paragraphs 117 to 118 and 154.

However, the IIED claim, nevertheless, fails for three independent reasons that do not depend upon the severity allegations being conclusory.

The other elements fail. Let's see: Intent, recklessness pled at 146, 150 through 151 and 155; outrageousness pled at 148; and causation at 152, they are pled only as element recitations, and they fail stripping.

The pleaded distress that does survive is insufficient as

a matter of law. Virginia requires distress so severe that no reasonable person could be expected to endure it.

Virginia law has repeatedly held that anxiety, sleeplessness, and counseling, exactly what Rose pleads that survives stripping, do not meet that bar. That's at *Harris v. Kreutzer*, *Russo*, and *Gilmer v. Jones*. *Gilmer v. Jones* is a Western District of Virginia case that dismissed IIED on exactly these manifestations. So, even if we credit the surviving allegations, element four fails on the law.

The surviving conduct that is speech fails under *Hustler*, which categorically bars a public official speech-based IIED, absent actual malice.

And I won't belabor the fact that the smear campaign claims at 106 and following in the complaint are -- do not survive under *Iqbal* and *Twombly*.

So, even crediting the surviving severity allegations, IIED in this case fails as pled on the other three elements under *Iqbal*.

On the legal insufficiency of the pleaded distress under *Harris*, *Russo* and *Gilmore*, and on the *Hustler Talbert* speech, collapses. The severity point does not rescue it, and the opposition does not address *Hustler*.

I'd like to address one other point that has not been raised, which I do raise in my memorandum, which is that the complaint demands injunctive relief. Prior restraint, as we

argued but was not responded to in our brief, the demand to enjoin future speech is an unconstitutional prior restraint, and we would ask for that to be stricken.

THE COURT: Thank you. Ms. Lau, would you like to respond to that last point, or do you all, essentially, concede that portion of it, in terms of the injunctive relief here not being appropriate?

MS. LAU: Your Honor, I would -- thank you. I would just respond by stating that there is no First Amendment protection for false statements. So, I mean, if -- I guess she could just be liable again for future statements that are false, but that's -- that's really all we're trying to prevent here with that injunctive relief.

THE COURT: Okay. Then -- that's a different issue, then, right? Because you have to -- even to ask for it, there has to be some indication that you know for sure that this is going to happen, right, in terms of -- That's a relief that this Court could not grant. Then we're getting into -- that's subject matter jurisdiction, okay. I can't reach that. It's not ripe. It hasn't happened.

MS. LAU: Okay, Your Honor.

THE COURT: It's speculative. Okay? Thank you. All right. So, this matter is before the Court on both defendant's motion to dismiss.

First, I will deal with the government's motion, because

it is -- part of it was conceded in terms of the defamation claims. You're not seeking -- asserting those against her for the statements that she made in the inquiry, part of the official inquiry. And, so, the crux of that motion really focuses on the intentional infliction of emotional distress claim, and that involves whether or not we've got to look to the Westfall Act here, and the Attorney General has certified that the defendants' participation in the Department of Energy's internal investigation was within the scope of her official duties.

And, as a result, then, the United States would be the proper defendant for any statements that were made in the -- that investigation. It does include even reports of harassment. And I agree that it is the District of Columbia's law that applies here, and not Virginia's, in terms of what counts as being in the scope of employment.

And I agree with the government in terms of, when you are responding to your employer's official inquiry, their investigation that they have started and that, what's been certified and not disputed here, then that is part of the scope of your duties.

And so, based on that alone, I'm finding that plaintiff's claims related to the sexual harassment reporting or investigation are barred by sovereign immunity here, okay, because this also falls under the FTCA.

So, the government's motion is granted. I don't think any

kind of discovery is necessary here, because you all have not disputed that this was part of a response to an official inquiry. Your challenge is that, Well, if she's making statements in the course of that, and we're saying that those statements are false, it's outside of the scope. Her participation was necessary because her employer required it. And there's no case law, no authority that you have provided me that suggests that any statements that she would have made in response as a part of that official inquiry that she has been required to participate in, would somehow take it outside of the scope of her employment. Okay.

MR. BARGHAAN: Your Honor, I want to make sure the record is clear. There was no order for her to participate. It was a request by the employer to --

THE COURT: But even a request is sufficient here --

MR. BARGHAAN: -- I agree --

THE COURT: -- Because it is part --

THE COURT REPORTER: I'm sorry.

THE COURT: Even a request would be sufficient here, because it is part of the official inquiry from her employer as part of their investigation.

MR. BARGHAAN: I agree. I just wanted to be candid with the Court.

THE COURT: Okay. Thank you.

And, so, now let's turn, then, to Ms. Hewitt's motion to

dismiss. And I think I was clear in what I was saying in terms of -- in some of my questions to you and comments during the argument.

Defamation, in order to plead that, you have to plead publication, an actionable statement, and the requisite intent. But, to be actionable, you know, the statement must be both false and defamatory, and a plaintiff must sufficiently allege that the statements tend to harm their reputation and to lower them in the estimation of the community.

The *Skillstorm* case, which both parties reference, talks about how -- or what is required in terms of the publication. And I want to be clear that plaintiff has also conceded that -- or accepted that -- he's a public official, and so you need actionable malice as well. And we have -- there are three buckets of alleged publications here.

It has to be something loosely stated as multiple individuals to a media outlet, and then to the Department of Energy investigators. We've already dealt with the investigators.

And here, you identify the speaker and the substance. I'm not getting into the whole issue of the declaration and what tracks the declaration or not. But, when you just reference multiple individuals, that is too threadbare. You are just essentially -- there's nothing there to provide context for the Court to infer, really infer anything there in terms of what

would count as an actionable statement that would be detrimental to his harm. You don't -- there's no indications of the when; to whom specifically the statements were made. Even with the media outlet, how it got out. I mean, you have those details. They just are not alleged in your complaint, according to you.

And so, I'm finding that the complaint is -- this amended complaint before me is deficient, and so I'm granting the motion to dismiss with respect to Counts 1 and 2, but giving you leave to amend.

Then, with respect to the intentional infliction of emotional distress claim, those are -- those are hard claims to plead, okay, in terms of what is required there.

Of course, you have to allege facts that would suggest that the conduct was intentional and reckless, that it was outrageous and intolerable, that it was a -- it caused emotional distress, and that the resulting distress was severe.

And so, they don't quibble with certain portions of it, those elements, and whether or not -- in terms of whether or not there was some emotional distress. She conceded that in some of her arguments.

But what we don't have sufficient allegations for is to get over that hurdle of what is so outrageous that it shocks the conscience. Because it has to be more than just the normal. It has to be something that is extreme. And here, we just don't have that. And it's also that the intentional infliction of

emotional distress claims kind of rise and fall right now with the defamation claims where we are. Okay? Because the emotional distress is based on those claims.

And so, I'm going to grant their motion to dismiss with respect to Count 3 as well, but I'm going to leave to amend.

How much time to amend? Would 21 days be sufficient?

MS. LAU: Yes, Your Honor.

THE COURT: Okay. All right. And it won't address the -- we're not going to redo the scope claims, okay? My ruling is final as to those. Your exceptions are preserved. Anything else?

MR. BARGHAAN: No, Your Honor. Thank you.

THE COURT: Anything else, Ms. Lau?

MS. LAU: No, Your Honor.

THE COURT: Okay. Thank you. Let's please call the next case.

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                    6/19/26

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**Date**

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace 6-19-26

---------------------------- ----------------

**Scott L. Wallace, RDR, CRR** **Date**

**Official Court Reporter**